IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2006 Session

**STATE OF TENNESSEE v. MACK TREMAINE JONES**

**Direct Appeal from the Criminal Court for Shelby County
No. 02-08108, 02-08109    Chris Craft, Judge**

---

**No. W2005-00014-CCA-R3-CD  - Filed June 27, 2007**

---

Following a jury trial, Defendant, Mack Jones, was convicted of one count of first degree murder and nine counts of attempted first degree murder.  Defendant was sentenced to life in prison for the first degree murder conviction and twenty-two years for each of the nine counts of attempted first degree murder, with all sentences to be served concurrently.  Defendant filed a motion for new trial which the trial court subsequently denied.  In this appeal, Defendant argues that (1) the evidence was insufficient to support Defendant's convictions for first degree murder and attempted first degree murder, and (2) the trial court erred in admitting evidence of ammunition discovered from Defendant's residence; admitting testimony that the photo line up contained a "juvenile photo" of Defendant; and excluding testimony that Defendant received a social security disability stipend and had difficulty counting money.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); James F. Schaeffer, Jr. and Robin Steward, Memphis, Tennessee, (at trial), for the appellant, Mack Tremaine Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Robert Carter, Assistant District Attorney General; and Reginald Henderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Geraldine Borner testified that on June 12, 2002, she left her home at 3448 Rosamond, Memphis, to run an errand.  She left her three-year-old daughter, Jessica Borner, at home in the care

of a friend. Ms. Borner's son, Derrick Borner, was also in the home. When Ms. Borner returned from her errand, she learned that her daughter had been killed and others wounded when three men opened fire on her home.

Tyrone Taylor testified that on the day of the incident he was visiting with a gathering of family and friends at 3448 Rosamond. Several of the children in attendance were sitting in the living room floor playing cards with their grandmother, Helen Hobbs. Mr. Taylor was outside the home playing dominoes with approximately ten other people. At some point, Christopher Burnett made a telephone call to George "G Bony" Franklin to purchase a ten dollar bag of marijuana. George Franklin delivered the bag of marijuana to Mr. Burnett and left the premises. Mr. Burnett immediately decided he did not want the bag of marijuana and called George Franklin to come back and get the marijuana and return the money.

George Franklin was upset at having to come back to the house and retrieve the marijuana. When he stepped into the yard at 3448 Rosamond, he was cursing the people in the yard and expressing his anger at having been called back. The commotion drew the attention of Mr. Taylor's grandmother who had come to the front door to see what was taking place in the yard. Mr. Taylor said, "George, you can't be in the yard with all that noise because my grandmother is right there in the door. . . . You've got to get out of the yard because she don't want you in her yard." George Franklin responded, "[p]ut me out of the yard." Mr. Taylor began to stand up, and George Franklin said, "Y'all see that. Y'all see that." George Franklin then got back in his car and left the premises.

Approximately one hour later, George Franklin returned to the residence with Defendant and Leslie Franklin. As the men got out of the car, Mr. Taylor saw that they were carrying guns. Defendant and Leslie Franklin were armed with machine guns resembling an AK-47 with long "banana" clips and knives attached to the end of the guns. George Franklin was armed with a handgun resembling a nine millimeter or .40 caliber pistol. As the men exited the car, Mr. Taylor stood up, raised his hands in the air, and said, "Come on, G Bony. You ain't going to do it like this, bro." The yard was fenced such that Mr. Taylor and the other individuals could not run away. As the three men continued to approach the yard, Mr. Taylor said, "You ain't fixin' to shoot it like that, is it, bro?" George Franklin responded, "Yeah. What's up now, Brother? What's up?" George Franklin then cocked his handgun and fired the gun directly at Mr. Taylor. George Franklin missed his mark, but continued firing his gun. He shot two more times and missed, and then Defendant and Leslie Franklin raised their guns and joined in the shooting.

Mr. Taylor attempted to dodge the bullets, but when the rifle shooting started, he was hit several times, with one bullet going completely through his forearm. Mr. Taylor ran inside the house and jumped through the back window. The men continued to shoot the rifles directly into the house. Once in the back yard, Mr. Taylor ran to a neighbor's house and called 9-1-1. As he returned to his house, he saw Defendant, Leslie Franklin, and George Franklin, "riding by smiling like they just did a real move or something." When Mr. Taylor entered the house, he saw "blood and a lot of bullet holes." Seven children were injured in the shooting, one child was killed, and Ms. Helen Hobbs was shot numerous times.

Brenda Coombs testified that she lived at 3460 Rosamond, two houses down from where the shooting occurred. Ms. Coombs was in her house at the time of the shooting and heard the shots being fired. A few minutes after the shooting stopped, Ms. Coombs looked out the window and saw three young black males getting into a car parked in front of her house. The two men getting into the passenger side of the vehicle were carrying assault rifles, one of which had a white bayonet extending off the front. Ms. Coombs wrote down the license plate number on the car and gave it to police officers when they came to take her statement. Ms. Coombs did not know the shooters, and said she would not recognize them if she saw them because she only saw their backs.

Sandra Hobbs Hawthorn testified that she, along with her mother, Helen Hobbs, her son, Marquavious Hobbs, and her daughter, Mariah Hobbs, lived at 3448 Rosamond at the time of the shooting. On the day of the shooting, many people were at the house, several of whom were children. The children were playing a card game with Helen Hobbs when Ms. Hawthorn left the house to run an errand. When she returned from running her errand, she walked directly into the house, put down her bag, and was suddenly shot in the back. Lloyd Banks, who was three-years-old at the time, was shot in the shoulder. Ms. Hawthorn "grabbed [him] and threw him under the bed and tried to grab more kids." Jessica Borner, who was also three-years-old, was in the kitchen when she was shot. Ms. Hawthorn saw Jessica reach her arm toward Ms. Hawthorn and then fall down. Ms. Hawthorn never saw Jessica alive again.

Ms. Hawthorn did not know exactly how many shots were fired because there were so many of them. She said that, "[e]verybody was shot. Blood was everywhere." Ms. Hawthorn could see the shooters through a hole in the wall and she recognized all three of them. She did not think that Defendant's bullets hit anyone. Ms. Hawthorn said that George Franklin "shot everybody," and she actually saw him shoot her in the back. She said that George Franklin had a handgun and the other two men had "long" guns. Ms. Hawthorn said that she had known Defendant his whole life, and he was "slower" than other kids his age, but was not the type who was easily led.

Several of the children present at 3448 Rosamond on the day of the incident testified to the events that occurred. Laquesha Owens, 15, Michael Owens, 12, Shaquesha Hobbs, 16, and Sherry Hobbs, 15, all testified that they were in the living room playing cards or other games when the shooting started. None of the children saw the shooters. They heard only the gunfire and commotion as the shooting started and saw the various injuries and blood when the shooting was over. All of the children suffered physical injury in the attack.

Derek Borner, who was thirteen-years-old at trial, testified that he was at 3448 Rosamond on the day of the shooting. Derek was in the front living room with the other children when he heard fighting in the front yard. He went to the front door and saw Tyrone Taylor and George "G Bony" Franklin engaged in an argument. Shortly thereafter, George Franklin left the yard, but said he would be back. Derek returned to the living room and approximately fifteen minutes later he heard gunshots. Derek got down on the living room floor and was not injured by the gunfire. He saw Sherry Hobbs and his sister, Jessica Borner, get shot. He dragged his sister back to the bedroom, but never saw her alive again.

Helen Hobbs testified that when the shooting occurred, she was playing cards in her living room with her grandchildren. Ms. Hobbs said that she heard a loud sound "like a bomb or something had hit the house." She realized that someone was shooting at the house and told the children to get down on the floor. Ms. Hobbs was shot seven times in various parts of her body. Ms. Hobbs did not see the shooters.

Christopher Burnett testified that he was visiting with the family at 3448 Rosamond on the day of the shooting. Mr. Burnett was sitting in the yard with several other individuals and someone made a call for him to purchase marijuana. George Franklin came to the house and brought Mr. Burnett a ten dollar bag of marijuana. The marijuana did not "look good" so someone called George Franklin to come back to Rosamond and return Mr. Burnett's money. George Franklin came back and gave Mr. Burnette his money back. During the exchange, Mr. Taylor and George Franklin got into an argument. George Franklin eventually left the yard, but said that he would be back.

Approximately thirty minutes later, George Franklin returned with two other men. The men got out of the car and approached the yard. George Franklin was carrying what looked like a .45 caliber handgun and the other two men were carrying "real big guns" one of which looked like it had a knife on the end. Mr. Burnett got down on the ground and turned his head away from the men. Mr. Burnett stayed down until the shooting was over. He heard the shots, but did not see the guns being fired.

Officer Christopher Vaden with the Memphis Police Department was the first officer to respond to the call from 3448 Rosamond. When he arrived at the scene, he found several wounded victims inside the house, but the shooters had already fled the scene. Officer Ricky Davison, also of the Memphis Police Department, testified that he was one of the crime scene investigators at 3448 Rosamond. Officer Davison observed "a lot of shell casings on the street, sidewalk and front lawn." Officer Davison said that his most significant observation was the residence itself, which was "badly shot" and reminded him of "swiss cheese." Inside the residence, Officer Davison observed "spent bullets" and "bloody clothing." There was blood on the bed sheets, and "the back northwest bedroom window looked like someone jumped through it" to get outside.

Officer Davison said that fourteen shell casings and four spent rounds of ammunition were recovered from the exterior of the house. The shell casings were 7.62 x 39 caliber, similar to those used in assault weapons such as an SKS or an AK-47. The officers were able to identify thirteen of the shell casings as Winchester brand. The remaining casing was not identified. There were bullet holes in the front door and bullet holes and strikes in the brick wall and frame surrounding the front door. There were also holes and strikes in the interior living room and kitchen walls. Officer Davison said that there was a total of twenty-five holes in the entire residence.

Memphis Police Officer Mary Pickens testified that as a member of the crime response unit, she responded to a call at 945 Faxon Steet where other officers were executing a warrant. Officer Pickens was informed that the residence belonged to Defendant, but said she had no personal knowledge of that fact. Officer Pickens collected various types of ammunition from Defendant's

residence including: 30/30 Winchester rife cartridges; Remington rifle cartridges, a box of 7.62 x 39 caliber Russian manufactured hunting cartridges, fifty American Eagle 9mm Luger pistol cartridges, and twenty 7.62 x 39 caliber Federal Classic rifle cartridges.

Sgt. T.J. Helldorfer of the Memphis Police Department testified that as a member of the homicide squad, he investigated the scene at 3448 Rosamond. Sgt. Helldorfer put together a photographic line-up from which Tyrone Taylor identified Defendant as one of the shooters. On the day after the incident, Sgt. Helldorfer and another officer returned to the scene for a final walk through. During the walk through, Sgt. Helldorfer discovered a spent 7.62 x 39 shell casing on the east side of the fence and another identical casing between the house and the fence. Sgt. Helldorfer also discovered a bullet in the door frame between the living room and the kitchen and another bullet under the dishes in the sink. Sgt. Helldorfer said that a search of Defendant's residence at 945 Faxon Street yielded ammunition for assault rifles and handguns "very similar to the type" found at the scene.

One week after the shooting, Defendant, accompanied by counsel, turned himself in to the police. Defendant agreed to be interviewed by Sgt. Helldorfer and signed a waiver of his *Miranda* rights. Sgt. Helldorfer said that throughout the interview, Defendant "spoke clearly" and "apparently understood because he never asked his attorney any clarification on anything [Sgt. Helldorfer] was asking him." In his statement, Defendant said that he lived at 945 Faxon Street with his mother and brother. On the day of the incident, he got a call from Leslie Franklin, and shortly thereafter George Franklin and Leslie Franklin picked him up at his house. Defendant was aware that George Franklin was upset about something, but he did not know what. The men drove to Rosamond and when they got out of the car, Defendant noticed that George Franklin was carrying a handgun and Leslie Franklin had a "long rifle type with a knife on the end of it." Defendant said that he was not carrying a gun. Defendant estimated that Leslie Franklin fired about six rounds at the house, but he did not see George Franklin fire his gun. When they returned to the car, Defendant ducked down in the back seat because he did not want to be recognized and "catch a charge." Defendant was dropped off at his house and then went out to complete some job applications.

Following his statement, the officers confronted Defendant with the evidence recovered from the search of his residence at 945 Faxon Street. This evidence included the ammunition from the initial search and a magazine for an assault rifle which contained a 7.62 x 39 caliber Wolf brand bullet from a subsequent search of the Faxon Street residence. Defendant denied any knowledge of the ammunition and could not explain its presence in his home. On cross-examination, Sgt. Helldorfer admitted that none of the ammunition found at Rosamond was the same brand as that recovered from 945 Faxon. He further admitted that the lab testing showed no connection between the magazine and the bullet recovered from the Faxon residence and the shooting at Rosamond.

Officer Kevin Shaver of the Memphis Police Department testified that no prints of any value were found on the evidence recovered from the Faxon residence.

Special Agent Heath Barker of the Tennessee Bureau of Investigation (T.B.I.) testified that of the fourteen shell casings or cartridges recovered from the scene, twelve were fired from one firearm and two from another. The cartridges submitted were consistent with rifle cartridges such as those used in an SKS or AK-47. The twelve cartridges from the same gun were manufactured by Winchester. The remaining two cartridges were made by an unidentified Russian manufacturer. Agent Barker could not definitively say whether the Russian shell casings came from the Russian ammunition box recovered from the Faxon Street residence. The tests were inconclusive as to whether the shell casings recovered from the crime scene had been fired from the magazine recovered from Defendant's Faxon Street residence.

Dr. O.C. Smith, an expert in forensic pathology, performed an autopsy on Jessica Borner and testified regarding the results. Jessica had one gunshot wound to the abdomen and one to the arm. Dr. Smith stated, "[t]he cause of death was a high velocity gunshot wound to the chest and abdomen. The manner was homicide." Dr. Smith further stated that such high velocity wounds were generally caused by a rifle and not a handgun.

Defendant's mother, Claradine Buford, testified that Defendant was in special education classes until he dropped out of school at the age of sixteen. Ms. Buford said that Defendant was not much of a talker, did not have many friends, and "associated" with only his cousins. Ms. Buford said that she protected Defendant and acted as his "mouthpiece" because she did not want other people to "down" him. She said that Defendant had a girlfriend and two children who lived with her and Defendant at 945 Faxon Street. Ms. Buford said that at the time of the shooting the family was still occupying the house, but they were actually staying with Defendant's grandmother because the utilities had been turned off at 945 Faxon Street. Ms. Buford saw Defendant with Leslie Franklin on one occasion when Leslie Franklin took Defendant to a party. She warned Leslie Franklin not to get Defendant into trouble. She said she was surprised to find out that Defendant was still hanging out with Leslie Franklin at the time of the shooting. Ms. Buford said that Defendant played video games, played basketball, knew how to operate a camcorder, a television, a telephone, and knew how to drive a car.

## II. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to sustain his convictions for first degree murder and attempted first degree murder because there was no proof that he intended to kill anyone at the Rosamond address. He further argues that not only did he lack the requisite intent to commit first degree murder, he was incapable of forming such intent due to his mental disability. As such, he argues that his convictions also cannot stand on a theory of criminal responsibility.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d

247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *State v. Goodwin*, 143 S .W.3d 771, 775 (Tenn. 2004) (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *Id.; State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Under Tennessee Code Annotated section 39-13-202(a)(1) (2003), first degree murder is the premeditated and intentional killing of another person. A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2) (2003). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. *Id*. Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the offense. Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include planning activity by a defendant prior to the killing; the

defendant's prior relationship with the victim; and the manner of the killing. *State v. Hall*, 958 S.W.2d 679, 704 (Tenn. 1997); *see also State v. Jones*, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); *State v. Schafer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993). Thus, for example, our Supreme Court has held that premeditation may be inferred from a defendant's use of a deadly weapon upon an unarmed victim; the cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's preparations prior to a killing for concealment of the crime; and calmness immediately after the killing. *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

Tennessee Code Annotated section 39-11-402(2) provides as follows:

A person is criminally responsible for an offense committed by the conduct of another if:

(1) Acting with the culpability required for the offense, the person causes or aides an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

T.C.A. § 39-11-402(1)-(3). "[T]he statute makes a defendant criminally liable for the acts of confederates that are the natural and probable consequence of the crime in which the defendant participated." *State v. Richmond*, 90 S.W.3d 648, 655 (Tenn. 2002). This is true so long as "the crimes committed by others were the foreseeable result of the consummation of the intended crime." *Id*. Furthermore, it is a well-settled principle that a Defendant may be found criminally liable for the acts of another even where the victim is a third-party, not the intended victim. *See Millen v. State*, 988 S.W.2d 164, 165 (Tenn. 1999).

Viewing the evidence in a light most favorable to the State, the proof showed that George "G Bony" Franklin and Tyrone Taylor got into an argument at 3448 Rosamond when a drug deal went sour. When George Franklin left the residence, he was upset and said that he would be back. He returned a short time later with Defendant and Leslie Franklin. All three men were armed; Defendant and Leslie Franklin carried assault rifles while George Franklin carried a handgun. The three men approached the house and opened fire on Tyrone Taylor and the other individuals in the

yard. When Mr. Taylor, who was hit several times, ran inside the residence, the assailants continued to fire their guns into the house. A total of eight individuals were injured in the attack, and a three-year-old child was killed. An investigating officer testified that the condition of the house following the shooting reminded him of "swiss cheese." This evidence was sufficient to conclude that Defendant intended to aid George Franklin in commission of the crimes.

Nevertheless, Defendant contends that he was "slow" and attended special education classes, and lacked sufficient mental capacity to form the requisite intent to commit the crimes. The jury heard this evidence, as well as evidence that Defendant was not the type of person who was easily led to do things. The jury also heard Defendant's mother's testimony that he was able to drive a car, play video games, and operate a camcorder and a television. Furthermore, in his statement to police, Defendant said that as the shooters drove away from the scene, he ducked down in the back of the car because he did not want to be recognized and "catch a charge." Implicit in this statement was Defendant's knowledge that what he did was wrong and that he could get in trouble with the police for his actions. It is also clear that Defendant was capable of premeditating his acts as evident by his effort to avoid getting arrested. A rational juror could certainly conclude that if Defendant could plan to avoid arrest after the offense, then he was capable of planning to assist in commission of the offense which would get him arrested. Based on the foregoing, we conclude that the evidence was sufficient for reasonable jurors to find that Defendant was guilty of the first degree murder of Jessica Borner and the attempted first degree murder of the other victims. Accordingly, Defendant is not entitled to relief on this issue.

## III. Evidentiary Issues

Defendant challenges the trial court's evidentiary rulings admitting the ammunition found at the Faxon Street residence; admitting Sgt. Helldorfer's testimony that the photo of Defendant in the photographic lineup was a "juvenile photo;" and excluding Defendant's mother from testifying that Defendant received social security payments for his mental disability.

The admissibility of evidence is generally within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003). The threshold determination is whether or not the proffered evidence is relevant. Pursuant to Rule 401 of the Tennessee Rules of Evidence, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "When arriving at a determination to admit or exclude even that evidence which is considered relevant, trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal when there is a showing of abuse of discretion." *Saylor*, 117 S.W.3d at 247. Although standing alone, a particular piece of evidence may be of questionable relevance, the evidence may still be admissible if it becomes relevant when taken in connection with other evidence. *State v. Ivey*, 360 S.W.2d 1, 4

(1962). In addition, it is not enough for the State "'merely to show that [a fact] may have been, but [the State] must go further and furnish some logical basis for the inference that it was or is.'" *Id*., 360 S.W.2d at 5 (citation omitted).

## A. Ammunition at Faxon Street Address

Defendant argues that the trial court abused its discretion by allowing the State to introduce evidence of the ammunition found at 945 Faxon Street. Defendant asserts that the spent casings from the crime scene did not "exactly match" the ammunition found at 945 Faxon Street. He further asserts that the State failed to establish that he had knowledge of the ammunition recovered from the Faxon Street residence. Citing Tennessee Rule of Evidence 403, Defendant contends that because the State could not adequately link the ammunition found at 945 Faxon Street to either Defendant or the crime scene, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Over Defendant's objection, the trial court allowed the State to introduce various types of ammunition discovered at 945 Faxon Street. In so doing, the trial court stated as follows:

> [Defendant's] defense so far from what I've heard is that he just went along and didn't know anything about what [George and Leslie Franklin] were going to do. And if he had ammunition found by a search warrant at his house then I think that would be probative. The question is what is the unfair prejudice and I find that there's no unfair prejudice to it because it's lawful to have ammunition. If these were drugs or something else that would show he was committing a crime it would be unfair. But under the circumstances its probative value substantially outweighs the unfair prejudice in my opinion. So I'm going to allow it under 403.

The proof established that Defendant lived at the Faxon Street residence. Defendant's mother testified to this fact, and Defendant provided this information in his statement to police. There was no evidence that Defendant was without access to the residence at the time of the crime. More than one eyewitness testified that Defendant was one of the assailants, and that he was armed with an assault rifle. The police recovered fourteen spent cartridges from the crime scene, all of which were 7.62 x 39 caliber, the type used in assault rifles. The police also recovered several rounds of 7.62 x 39 caliber bullets from Defendant's Faxon Street residence. A magazine used in an assault rifle was also recovered from the Faxon residence. The magazine contained one 7.62 x 39 caliber bullet. Although there was no direct link established between the evidence from the Faxon Street residence and the evidence from the crime scene, we nonetheless conclude that the ammunition from the Faxon Street residence was relevant and probative to show a circumstantial connection between Defendant and the type of weapon and ammunition used in the attack. Furthermore, as noted by the trial court, admission of the evidence from the Faxon Street address was not prejudicial because Defendant was legally in possession of the items. Accordingly, the trial court did not abuse its discretion in finding that the probative value of the ammunition and magazine

was not substantially outweighed by the danger of unfair prejudice. Defendant is not entitled to relief.

## B. Juvenile Photograph

Defendant next argues that the trial court abused its discretion in allowing Sgt. Helldorfer to refer to Defendant's photograph in the photographic lineup as a "juvenile photo." Defendant contends that the reference to the juvenile photo violated Rule 609 of the Tennessee Rules of Evidence in that the reference allowed the jury to infer that Defendant had a juvenile criminal record. Defendant contends that admission of his juvenile record "cannot be deemed harmless especially since the credibility of [his] statement to police was at issue."

Tennessee Rule of Evidence 609 sets forth the parameters within which one may impeach a witness by admitting evidence of his or her prior conviction of a crime. *See* Tenn. R. Evid. 609. Pursuant to Rule 609(d), in a criminal trial, a defendant's juvenile record may not be used to impeach his testimony. *See* Tenn. R. Evid. 609(d). In the present case, Rule 609 is not applicable because Defendant was not testifying, and the evidence was not introduced to impeach his credibility. Indeed, there is nothing in the record indicating that Defendant's juvenile record was introduced as evidence at trial.

During Sgt. Helldorfer's testimony, the State introduced as evidence the "master photo spread" used during the police investigation of the shooting. A master photo spread or photographic lineup was used for each suspect. Each photo spread contained six individual pictures. While identifying the photo spread which contained Defendant's picture, Sgt. Helldorfer made a comment that "the photos appear to be juvenile photos." Defendant objected to the use of the term "juvenile photo" on grounds that it improperly implied that Defendant had a juvenile criminal record. In overruling the objection, the trial court explained that juries often wonder where the photographs used in the photo spreads come from, and the fact that Sgt. Helldorfer referred to the photographs as "juvenile photos" rather than "mugshots" or "prior arrest photos" was not inappropriate since the jury could have just as easily inferred that the photos were school pictures. We agree with the trial court. Sgt. Helldorfer did not single out Defendant's photograph as juvenile, he did not say the photo was from a prior arrest, and he made no reference to Defendant's juvenile record. As such, the trial court did not err in allowing Sgt. Helldorfer's statement into evidence. Defendant is not entitled to relief.

## C. Diminished Capacity

In his final argument, Defendant contends that the trial court erred in excluding testimony from Defendant's mother that Defendant received a social security stipend for his mental disability, and Defendant had trouble counting money. Defendant argues that this evidence is relevant to show that he suffered from diminished capacity as a result of his mental disability and therefore was not capable of forming the requisite *mens rea* for the crime charged. Defendant acknowledges that he did not raise this issue in his motion for new trial, but requests that this Court review the issue under

the doctrine of plain error. Defendant argues that it was plain error for the trial court to exclude the testimony because lay witness testimony alone is sufficient evidence to show a defendant suffers from diminished capacity. He contends that even if our case law is to the contrary, this Court should find that lay witness testimony alone is sufficient to establish diminished capacity. In the alternative, Defendant asserts that even if the trial court properly found that his mother's testimony was inadmissible to prove diminished capacity, he is still entitled to relief because the trial court's ruling violated his constitutional right to present a proper defense.

A trial court's ruling excluding evidence may not be challenged on appeal unless the substance of the evidence and its evidentiary basis supporting admission are presented to the trial court by an offer of proof or were apparent from the context. Tenn. R. Evid. 103(a)(2); *State v. Robinson*, 73 S.W.3d 136, 150 (Tenn. Crim. App. 2001). The offer of proof must demonstrate the substance, purpose, and relevance of the excluded evidence so the trial court may make an informed ruling. *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). An offer of proof also creates a record from which the appellate court can review the trial court's decision. *State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986). The failure to make an offer of proof concerning evidence excluded at trial results in waiver of the issue. *See State v. Sims*, 45 S.W.3d 1, 15 (Tenn. 2001).

In the present case, Defendant failed to make an offer of proof regarding his mother's testimony. We are therefore precluded from reviewing the trial court's decision to exclude the testimony. To hold otherwise would require us to speculate as to what Defendant's mother would have said and whether such testimony was both relevant and admissible. *See State v. Robinson*, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997). Even were we to conclude that the record was sufficient for a review of the issue, Defendant's failure to include the issue in his motion for new trial likewise results in waiver of the issue. Ordinarily, "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Nonetheless, Defendant urges this Court to review the issue under the doctrine of plain error.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *State v. Kevin Young*, No. W2005-01180-CCA-R3-CD, 2006 WL 1132089, at *5 (Tenn. Crim. App., at Jackson, April 26, 2006) (no Tenn. R. App. P. 11 application filed) (citing *State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983)). When deciding whether plain error exists, appellate courts consider five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the

accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established, and consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Smith*, at 283. Moreover, the error must be of such great magnitude that it probably changed the outcome of the trial. *Id*.

Defendant has not shown the presence of all five factors necessary for a finding of plain error. The third factor, "a substantial right of the accused must have been adversely affected," is not present because there was no offer of proof as to the excluded portion of Defendant's mother's testimony. Without knowing what the excluded testimony would have been, we cannot determine whether any right of the accused was adversely affected. Additionally, Defendant has failed to meet his burden as to the first factor which mandates that "the record must clearly establish what occurred in the trial court." Although technically the transcript does show what happened, without the offer of proof, the record does not and cannot completely establish what occurred in the trial court because the disputed evidence is non-existent. Accordingly, Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE